UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| HOLLIE GAITHER,<br>    *Plaintiff,*<br>*v.*<br>*STOP & SHOP SUPERMARKET CO LLC,*<br>    *Defendant.* | Civil No. 3:13cv658 (JBA)<br><br>January 7, 2015 |

**RULING ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Defendant Stop & Shop Supermarket Co LLC ("Stop & Shop") moves [Doc. # 30] for summary judgment on Plaintiff Hollie Gaither's claims under the Connecticut Fair Employment Practices Act ("CFEPA") for failure to grant her a reasonable leave of absence or to make a reasonable effort to transfer her to a suitable temporary position in order to accommodate her disability resulting from pregnancy and wrongful termination because of her pregnancy.[1]  For the reasons that follow, Defendant's motion is denied.

**I.    Facts**

Plaintiff began working at a Stop & Shop supermarket in Glastonbury, Connecticut in October 2011 as a part-time floral clerk, cashier, bagger, and self-scan monitor, working approximately 15 to 25 hours per week.  (Gaither Dep., Ex. 4 to Def.'s Loc. R. 56(a)1 Stmt. [Doc. # 32] at 74–76.)  As a part-time employee, Ms. Gaither was not entitled to benefits, such as health insurance or paid leave.  (*Id.* at 184–85.)  In January 2012, Ms. Gaither became pregnant and immediately notified Jim Fusco and Lynn

---

[1] The one-count Complaint [Doc. # 1] alleges pregnancy discrimination in violation of Conn. Gen. Stat. § 46a-60(a)(7)(A), (B), and (E) and was originally filed in state court and removed to federal court by Defendant on the basis of diversity of citizenship.

Nelson, assistant store managers, who both responded by congratulating her. (*Id.* at 83–87.) Plaintiff continued her normal duties while pregnant, however, in June 2012, she started to suffer from extreme back pain as a result of her pregnancy and her doctor restricted her from lifting objects greater than fifteen pounds. (*Id.* at 93, 109, 147–48.) Ms. Gaither presented Ms. Nelson with a note from her obstetrician, dated June 4, 2012 (Ex. 11 to Def.'s 56(a)1), noting the weight restriction (Gaither Dep. at 112).

Prior to this date, Plaintiff had not had any problems with Ms. Nelson, but afterwards Ms. Nelson would on an almost daily basis assign her tasks that required her to exceed her lifting restriction. When Ms. Gaither would remind Ms. Nelson of the lifting restriction, Ms. Nelson would respond by saying that "[w]e have a business to run" or "you need to do it, this is the job, you have to do your job" or she would just ignore Plaintiff, making a "huff noise" and storm away. (*Id.* at 32, 28, 119–20.)

In July 2012, the final month of Ms. Gaither's pregnancy, her back pain became even more severe and she had to call out sick for several days. (*Id.* at 151–52.) On July 28, 2012, Ms. Gaither presented Ms. Nelson with a doctor's note from two days prior that memorialized her appointment (Ex. A to Pl.'s Loc. R. 56(a)2 Stmt. [Doc. # 38]), but did not contain any further medical restrictions or diagnosis. Ms. Nelson responded, "I don't care what you're going through, what type of pain, we have a business to run, and you have a job to do." (Gaither Dep. at 156.) Ms. Nelson, Ms. Gaither, and the store manager, Bill Haberern, then had a meeting in Mr. Haberern's office in which Ms. Nelson explained Ms. Gaither's lifting restriction. Mr. Haberern had apparently been unaware of the lifting restriction previously and upon learning of it, he said that Ms. Gaither should have been terminated as soon as she submitted the doctor's note with the restriction and

explained to Ms. Gaither that she would now have to be "terminated." (Gaither Dep. at 164–65.) Ms. Gaither asked if she could instead take medical leave, but Mr. Haberern explained that she was not eligible under company policy because she had not worked for the company for a year. Mr. Haberern said that she was welcome to return to the company when she was ready, but Ms. Gaither contends that she was told that she would need to apply for her position again and there was no guarantee that there would be an open position or that she would be rehired. (Nelson Dep., Ex. 7 to Def.'s 56(a)1 at 60–62; Gaither Dep. at 174.)

Ms. Gaither asked Mr. Haberern to draft a letter memorializing her termination. (Gaither Dep. at 174.) In a letter dated July 30, 2012, Mr. Haberern wrote:

> Hollie Gaither has been employed by Stop and Shop Supermarkets since October 21, 2011. Her employment has been terminated as of this past Sunday, July 29th, 2012, as she is presently unable to fulfill the requirements of her job description relative to lifting. We are looking forward to having Hollie back, when she is back to 100%.

(Haberern Ltr., July 30, 2012, Ex. 17 to Def.'s 56(a)1.)

Two weeks later, on August 12, 2012, Ms. Gaither gave birth and was medically able to resume work thereafter. However, she never reapplied to work at Stop & Shop explaining that she did not feel that she was welcome to return given that Mr. Haberern had fired her rather than providing her with a leave of absence as she requested. (Pl.'s Resps. to Def.'s Interrogs., Ex. 18 to Def.'s 56(a)1 at 7–8; Gaither Dep. at 176, 182–84.)

After losing her job, Plaintiff was unable to afford her rent and was evicted from her apartment shortly after she gave birth. (Gaither Dep. at 43–44.) Although Ms. Gaither would have been without income even if she had been granted the unpaid leave

of absence that she requested, she contends that her termination caused her eviction, because an employee of her landlord said that because the landlord did not know how long it would take Ms. Gaither to find another job, the landlord would have to evict her for nonpayment of the rent whereas if she was just on leave he could have "worked with" her. (*Id.* at 202–03, 205.) After being evicted, Ms. Gaither and her husband became homeless and moved to South Carolina to stay with his family for a time. However, in January 2013, the family told Ms. Gaither and her husband that they had to leave and they wound up living in a homeless shelter. (*Id.* at 208–09.)

II.     **Discussion**[2]

Although pregnancy discrimination claims are generally analyzed under the *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973) framework, "the *McDonnell Douglas* framework does not apply where, for example, a plaintiff is able to produce direct evidence of discrimination." *Swierkiewicz v. Sorema N. A.*, 534 U.S. 506, 511 (2002). Here, there is no factual dispute that Plaintiff was terminated because of her pregnancy-

---

[2] Summary judgment is appropriate where, "resolv[ing] all ambiguities and draw[ing] all permissible factual inferences in favor of the party against whom summary judgment is sought," *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008), "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law," Fed. R. Civ. P. 56(a). "A dispute regarding a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Williams v. Utica Coll. of Syracuse Univ.*, 453 F.3d 112, 116 (2d Cir. 2006) (quotation marks omitted). "The substantive law governing the case will identify those facts that are material, and '[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.'" *Bouboulis v. Transp. Workers Union of Am.*, 442 F.3d 55, 59 (2d Cir. 2006) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). When considering a motion for summary judgment, the Court may consider depositions, documents, affidavits, interrogatory answers, and other exhibits in the record. Fed. R. Civ. P. 56(c).

related medical restrictions and the primary question is a legal one: whether this termination was prohibited under CFEPA. *Cf. Craine v. Trinity Coll.*, 259 Conn. 625, 637 (2002) ("[The *McDonnell Douglas*] methodology is intended to provide guidance to fact finders who are faced with the difficult task of determining intent in complicated discrimination cases. It must not, however, cloud the fact that it is the plaintiff's ultimate burden to prove that the defendant intentionally discriminated against her because of her sex.").

Defendant contends that this termination was not discriminatory under CFEPA because Plaintiff's "lifting restriction rendered her unable to perform the essential functions of her job" and "terminating a woman's employment because she is unable to perform essential job functions as a result of pregnancy complications does not constitute pregnancy discrimination"[3] and "[t]here is no evidence suggesting that Stop & Shop treated Plaintiff differently from any non-pregnant employees with similar physical limitations." (Def.'s Mem. Supp. [Doc. # 31] at 9–12.)

Defendant's exclusive reference to Title VII cases in support of its arguments is misplaced here because, while the Connecticut Supreme Court has "often looked to federal employment discrimination law for guidance in enforcing our own antidiscrimination statute," it has "also recognized that, under certain circumstances,

---

[3] Although Defendant maintains that Plaintiff was unable to perform the written job description of her job, which required lifting up to 60 pounds as a floral clerk and 25 pounds as a cashier (Exs. 9–10 to Def.'s 56(a)1), both Ms. Nelson and Mr. Haberern testified that Ms. Gaither's restriction could be accommodated despite the written job descriptions for her positions and she worked in such positions with this restriction in place for over a month and a half prior to her termination (Nelson Dep. at 55–56; Haberern Dep. at 99).

federal law defines the beginning and not the end of our approach to the subject." *State v. Comm'n On Human Rights & Opportunities*, 211 Conn. 464, 470 (1989) (internal quotation marks omitted)).  Thus, while in many instances there are "similarities between Title VII and the Connecticut law, . . . the state statute contemplates broader relief than its federal counterpart." *Graham v. State of N.Y., Dep't of Civil Serv.*, 907 F.2d 324, 327 (2d Cir. 1990) (interpreting Title VII and distinguishing Connecticut law); *see also Murphy v. Robert Burgess & Norwalk Econ. Opportunity Now, Inc.*, No. 3:96CV01987 (AHN), 1997 WL 529610, at *4 (D. Conn. July 16, 1997) ("CFEPA is, in many respects, stronger than the federal act, and . . . the difference between the state and federal acts was purposeful and is meaningful.").

Under Title VII, pregnancy discrimination is defined as a form of gender-based discrimination and prohibited on this basis.  *See O'Bar v. Borough of Naugatuck*, No. CIV.3:01CV867(PCD), 2002 WL 32769183, at *4 n.6 (D. Conn. Dec. 3, 2002) ("The Pregnancy Discrimination Act, codified at 42 U.S.C. § 2000e(k), is not a basis for [a] claim independent of Title VII's prohibition against gender discrimination.").  Title VII provides:

> It shall be an unlawful employment practice for an employer . . . to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.

42 U.S.C. § 2000e-2(a)(1).  Originally, there was no provision in Title VII specifically protecting pregnant employees, but with the Pregnancy Discrimination Act of 1978

("PDA"), 42 U.S.C. § 2000e(k), Congress amended the definition of gender-based discrimination under Title VII to include pregnancy:

> The terms "because of sex" or "on the basis of sex" include, but are not limited to, because of or on the basis of pregnancy, childbirth, or related medical conditions; and women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes . . . as other persons not so affected but similar in their ability or inability to work . . . .

42 U.S.C. § 2000e(k).

It is "well established" that the PDA was passed in reaction to the Supreme Court's decision in *General Electric Co. v. Gilbert,* 429 U.S. 125 (1976), which held that it was not discrimination "because of sex" for a company's disability plan to provide coverage during a period of disability resulting from nonoccupational causes but to exclude from coverage disability arising from pregnancy. *Newport News Shipbuilding & Dry Dock Co. v. E.E.O.C.*, 462 U.S. 669, 678 (1983). The *Gilbert* dissenters argued that the company's plan, which was intended to provide employees with protection against the risk of uncompensated unemployment caused by physical disability, discriminated on the basis of sex by giving men protection for all categories of risk but giving women only partial protection. Thus, the dissenters asserted that the statute had been violated because conditions of employment for females were less favorable than for similarly situated males. *See Gilbert*, 429 U.S. at 155 (Brennan, J., dissenting).

When Congress passed the PDA, "it unambiguously expressed its disapproval of both the holding and the reasoning of the Court in the *Gilbert* decision," and many of the bill's proponents "expressly agreed with the views of the dissenting Justices" from *Gilbert*. *Id.* at 678–79. The second clause of § 2000e(k) providing that pregnant women must be

7

treated the same as non-pregnant workers who are "similar in their ability or inability to work," "explains the application of the general principle to women employees," *Newport News Shipbuilding*, 462 U.S. at 679 n.14. Read in this context, the PDA "makes clear that it is discriminatory to treat pregnancy-related conditions less favorably than other medical conditions" "because only women can become pregnant." *Id.* at 684.

The "PDA does not *require* employers to extend any benefits to pregnant women that they do not already provide to other disabled employees," *California Fed. Sav. & Loan Ass'n v. Guerra*, 479 U.S. 272, 286 (1987), but rather provides that "women as capable of doing their jobs as their male counterparts may not be forced to choose between having a child and having a job," *UAW v. Johnson Controls, Inc.*, 499 U.S. 187, 204 (1991). Thus, a Title VII plaintiff must prove that "she was treated less favorably than a nonpregnant employee under identical circumstances and that her pregnancy was the

reason she was treated less favorably."[4]  *Piraino v. Int'l Orientation Res., Inc.*, 137 F.3d 987, 990 (7th Cir. 1998) (internal quotation marks and alterations omitted).

By contrast, under CFEPA, pregnancy discrimination is not defined as a form of gender discrimination, which is separately addressed in Conn. Gen. Stat. § 46a-60(a)(1), but rather CFEPA has specific provisions requiring accommodation of pregnant employees:

---

[4] The Supreme Court recently heard oral argument in *Young v. United Parcel Serv., Inc.*, where the Fourth Circuit had held that a "UPS policy limiting light duty work to some employees—those injured on-the-job, disabled within the meaning of the ADA, or who have lost their DOT certification—but not to pregnant workers" did not violate the PDA. *Young v. United Parcel Serv., Inc.*, 707 F.3d 437, 445 (4th Cir. 2013) *cert. granted*, 134 S. Ct. 2898 (2014). Young's job description required her to be able to lift up to 70 pounds, but she was medically restricted to 20 pounds while pregnant. *Id.* at 448. Young claimed that the fact that UPS offered light-duty assignments to some employees, but not pregnant workers "constitutes direct evidence of discrimination." *Id.* at 446. The Fourth Circuit rejected this argument, holding that "UPS has crafted a pregnancy-blind policy" and that Young's interpretation of the PDA "would require employers to provide, for example, accommodation or light duty work to a pregnant worker whose restrictions arise from her (off-the-job) pregnancy while denying any such accommodation to an employee unable to lift as a result of an off-the-job injury or illness" and "would thus imbue the PDA with a preferential treatment mandate that Congress neither intended nor enacted." *Id.* at 446–48. The Supreme Court is faced with the question under Title VII of "[w]hether, and in what circumstances, an employer that provides work accommodations to nonpregnant employees with work limitations must provide work accommodations to pregnant employees who are 'similar in their ability or inability to work'"? but Young does not dispute that "[s]o far as the PDA is concerned, an employer is free to accommodate none of its workers," as long as pregnant employees are treated equally. *Young v. UPS*, 12-1226, Pet.'r's Br. at i, 29. Because, as discussed above, Plaintiff here does not challenge the disparate treatment of pregnant and non-pregnant employees but rather challenges only the failure to provide specific accommodations to her required by state law, the disposition of *Young* will not affect this case, but it is illustrative of the differing scope of Title VII and CFEPA.

> It shall be a discriminatory practice in violation of this section . . . . For an employer, by the employer or the employer's agent: (A) To terminate a woman's employment because of her pregnancy; (B) to refuse to grant to that employee a reasonable leave of absence for disability resulting from her pregnancy; . . . (D) to fail or refuse to reinstate the employee to her original job or to an equivalent position . . . upon her signifying her intent to return . . .; [or] (E) to fail or refuse to make a reasonable effort to transfer a pregnant employee to any suitable temporary position which may be available in any case in which an employee gives written notice of her pregnancy to her employer and the employer or pregnant employee reasonably believes that continued employment in the position held by the pregnant employee may cause injury to the employee or fetus.

Conn. Gen. Stat. § 46a-60(a)(7).[5]

In *California Fed. Sav. & Loan Ass'n*, the Supreme Court upheld a California law, similar to CFEPA, which provided greater protection to pregnant women than Title VII by "establish[ing] benefits that employers must, at a minimum, provide to pregnant workers," including maternity leave and guaranteed reinstatement. 479 U.S. at 291; *cf. Piraino*, 84 F.3d at 274 ("The PDA . . . . does not impose an affirmative obligation on employers to offer maternity leave or to take other steps to assist pregnant workers, but it does require the employer to treat the employee as well as it would have if she were not pregnant.").

The Supreme Court noted that when Congress was debating the PDA, it "was aware of [preexisting] state laws" including CFEPA, but did not consider them to be a form of "reverse discrimination" against men that would themselves violate Title VII. *California Fed. Sav. & Loan Ass'n*, 479 U.S. at 287 & n.24 (citing Conn. Gen. Stat. § 46a-

---

[5] As Plaintiff was not granted pregnancy leave, she does not assert a claim for failure to reinstate under Conn. Gen. Stat. § 46a-60(a)(7)(D).

60(a)(7)). Rather, "Congress intended the PDA to be a floor beneath which pregnancy disability benefits may not drop—not a ceiling above which they may not rise." *Id.* at 285; *see also* 42 U.S.C. § 2000e–7.

CFEPA "on its face indicates that Connecticut has exercised this prerogative" to provide pregnant employees with greater protection than Title VII does. *Zamore v. Dyer*, 597 F. Supp. 923, 928 (D. Conn. 1984). Thus, even if Defendant is correct that "[t]here is no evidence suggesting that Stop & Shop treated Plaintiff differently from any non-pregnant employees with similar physical limitations" (Def.'s Mem. Supp. at 10), this argument is beside the point because CFEPA requires employers to provide certain benefits and protections for pregnant employees, such as "a reasonable leave of absence for disability resulting from her pregnancy," § 46a-60(a)(7)(B), and "a reasonable effort to transfer a pregnant employee to any suitable temporary position," § 46a-60(7)(E). *Cf. Fenn Mfg. v. Comm'n on Human Rights & Opportunities*, No. CIV. CV 92-509435, 1994 WL 51143, at *15 (Conn. Super. Ct. Feb. 8, 1994) ("The statute thus empowers workers who wish both to work during pregnancy and to avoid maternal and fetal hazards in the workplace to do so by having reasonable options to continue working elsewhere to avoid those hazards.").

Defendant acknowledges that it "did not formally grant Plaintiff a leave of absence" but contends that "the result was indistinguishable" because as a result of her termination, she did not work the last two weeks of her pregnancy, and with Mr. Haberern's July 30, 2012 letter stating that he "was looking forward to having [Plaintiff] back, when she is back to 100%," "Plaintiff's situation would have been no different if Stop & Shop had called the period between July 28 and August 12 a leave of absence

11

instead of a termination with an invitation to return."[6]  (Def.'s Mem. Supp. at 13.) Plaintiff counters that her "termination was *not* indistinguishable from a leave of absence" because she was told only that "she *might* be rehired in the future *if* there was a position available."  (Pl.'s Opp'n [Doc. # 37] at 17–18.)  Contrary to Defendant's assertions, termination with only a non-binding vague statement that the employer "was looking forward to having [Plaintiff] back" is not the equivalent of granting a leave of absence.  Defendant's argument is belied by the text of CFEPA which prohibits an employer from refusing "to grant to that employee a reasonable leave of absence," § 46a-60(a)(7)(B), and explicitly prohibits termination "because of" an employee's pregnancy, § 46a-60(a)(7)(A).

Additionally, under CFEPA an employee on maternity leave is generally entitled to reinstatement "to her original job or to an equivalent position with equivalent pay and" benefits, Conn. Gen. Stat. § 46a-60(a)(7)(D), which is a protection that would not be afforded to an employee who is denied such leave and thus there is plainly a significant difference between being granted leave under CFEPA and being terminated.  *See Zamore*, 597 F. Supp. at 927 ("Unlike Title VII, [§ 46a-60(a)(7)(D)] explicitly provides that a[n] . . .

---

[6] Although Mr. Haberern testified that he would not have made Ms. Gaither reapply for her position and would have definitely rehired her if she called him once she was medically cleared to work and that he told Plaintiff as much (Haberern Dep., Ex. 8 to Def.'s 56(a)1 at 80–81, 46), there is a dispute of fact on this point with Plaintiff claiming that Mr. Haberern explicitly stated that she would have to reapply for her position and her rehiring was not guaranteed, which she said was "kind of devastating at the time" because she "believed that they were going to give me a leave" of absence and "did not expect him to fire me."  (Gaither Dep. at 174, 208–09).

employer must reinstate an employee to her original or an equivalent position following maternity leave, if one is granted.").

In *Zamore*, the court held that an employer did not comply with the statutory requirement of reinstatement under § 46a-60(a)(7)(D), when the plaintiff was terminated while on maternity leave and the employer later "invited" her to apply for another position because "an invitation to apply for a possible job is not the same as the statutorily mandated placement in an equivalent position." 597 F. Supp. at 925 n.1.

Defendant does not discuss any § 46a-60(a)(7)(B) case law and simply maintains that there was no effective difference between offering Plaintiff leave and terminating her with the understanding that she could be rehired.[7] (Reply [Doc. # 39] at 4.) Given that Defendant's argument is not supported by the clear text or statutory framework of the relevant CFEPA provisions, and because a factfinder could credit Plaintiff's statement that she was denied leave and never told that she was guaranteed to be rehired after termination, Defendant is not entitled to summary judgment on the denial of leave claim.

---

[7] Plaintiff, for her part, cited only two cases analyzing CFEPA's pregnancy leave provision, both of which she acknowledges are not directly applicable here. (Pl's Opp'n at 8 n.2.) In *Comm'n of Human Rights & Opportunities v. Truelove & MacLean, Inc.*, No. 115306, 1995 WL 415808, at *8 (Conn. Super. Ct. June 28, 1995) *aff'd sub nom. Comm'n on Human Rights & Opportunities v. Truelove & Maclean, Inc.*, 238 Conn. 337 (1996), the court affirmed a Commission on Human Rights and Opportunities ("CHRO") hearing officer determination that an employer violated CFEPA by failing to grant leave, but this finding was not addressed on appeal which instead primarily concerned the remedies available for such violations. In *Kenney v. Dep't of Mental Health & Addiction Servs.*, HHDCV020813589S, 2012 WL 3641824, at *8 (Conn. Super. Ct. July 26, 2012), the court granted summary judgment to an employer on a failure-to-grant leave claim under CFEPA and the FMLA because the plaintiff had been offered FMLA leave but failed to complete the required documentation.

These same facts could also support a wrongful termination claim. For example, in *Davis v. Manchester Health Ctr., Inc.*, 88 Conn. App. 60, 64 (2005), a nurse informed her supervisor that a physically-demanding assignment that she had been given presented a risk to her health and that of her unborn child and requested another less physically demanding assignment. The supervisor refused to reassign her, even though such an assignment was available, and the plaintiff left her shift rather than accept the demanding assignment and was later terminated. *Id.* Upholding a jury verdict for the plaintiff, the court held that § 46a–60(a)(7)(A) could be violated when an employee was terminated "for choosing to leave her shift rather than to remain in an assignment she reasonably believed posed a risk to her health and that of her unborn child" and that the "jury reasonably could have found, therefore, that a direct nexus existed between the plaintiff's pregnancy and the defendant's termination of the plaintiff's employment." *Id.* Here, too a jury could reasonably determine that Plaintiff's termination was the result of Defendant's failure to provide her with pregnancy leave and thus Defendant is not entitled to summary judgment on the wrongful termination claim.

Defendant contends that the failure to transfer claim fails because "there is no evidence suggesting that either Stop & Shop or Plaintiff believed that her continued employment in her existing positions—floral clerk and cashier—might cause injury to Plaintiff or her fetus." (Def.'s Mem. Supp. at 15.) However, this argument is contradicted by the premise of Defendant's defense to this case, which is that due to the 15-pound lifting restriction Plaintiff "was not qualified for the floral clerk or cashier positions at that time." (*Id.* at 9.) Clearly, if Plaintiff's job required her to exceed a medically-imposed lifting restriction, then continuing in such a position could "cause injury to the employee

14

or fetus." Conn. Gen. Stat. § 46a-60(a)(7)(E).  Second, Defendant contends that, at the time of her termination, there was not a suitable position to which Plaintiff could have been transferred because she did not believe that she could have continued working. However, at oral argument, Plaintiff clarified that she does not claim a failure to transfer on the date of her termination when she instead sought pregnancy leave, but rather claims a failure to transfer starting on June 5, 2012, when the weight restriction was imposed.  Plaintiff acknowledges that she never specifically requested a transfer to another position, but she contends that after she advised Ms. Nelson of her lifting restriction, Ms. Nelson nevertheless demanded on an almost daily basis that Plaintiff perform tasks requiring her to exceed this lifting restriction.  (Gaither Dep. at 27.) Therefore, a jury could reasonably conclude that by keeping Plaintiff in an assignment with a written job description that required her to lift in excess of her medical restriction and demanding that Plaintiff in fact exceed her lifting restriction, she was effectively denied a transfer.  Thus, Defendant's Motion for Summary Judgment is denied as to the failure to transfer claim.

A.   **Summary Judgment as to Remedies**

Finally, Defendant moves for summary judgment on Plaintiff's claimed remedies.[8] Defendant contends that its invitation to Plaintiff to reapply for her position and her failure to do so precludes an award of damages for back or front pay.[9] (Def.'s Mem. Supp. at 16–17.)  However, as discussed above, Defendant's offer was not unconditional, and *Comm'n on Human Rights & Opportunities v. Truelove & Maclean, Inc.*, 238 Conn. 337, 349 (1996), cited by Defendant, was a failure to reinstate claim under § 46a-60(a)(7)(D), which is not asserted by Plaintiff here, and in any event held only that the award of back pay was "discretionary rather than mandatory," not that the failure to reapply precluded

---

[8] "Some courts have limited the availability of summary judgment motions to foreclosure of specific claims, not remedies," *Hamblin v. British Airways PLC*, 717 F. Supp. 2d 303, 306 (E.D.N.Y. 2010), but a 2010 amendment to Rule 56 clarified that a party could move for summary judgment on "part of each claim or defense," Fed. R. Civ. P. 56(a), which was intended "to make clear . . . that summary judgment may be requested not only as to an entire case but also as to a claim, defense, or part of a claim or defense," Fed. R. Civ. P. 56 advisory committee note (2010), and even before the amendment, "the Second Circuit has regularly reviewed grants of 'partial summary judgment,' eliminating elements of damages before trial," *Hamblin*, 717 F. Supp. 2d at 308 (collecting cases); *see also* 11-56 *Moore's Federal Practice - Civil* § 56.122 ("The freedom to use summary judgment procedure to address particular issues or elements of a claim is an important feature of Rule 56, making it a much more useful case management device.").

[9] At oral argument, Plaintiff stated that she is not pursuing damages for lost benefits, which she did not earn as a part-time employee.

an award of back pay as a matter of law.[10]  Likewise, as to front pay, the case cited by Defendant makes clear that "[a]n award of front pay is a form of equitable relief, which is a matter for the trial judge's equitable discretion," *Shaw v. Greenwich Anesthesiology Assocs., P.C.*, 200 F. Supp. 2d 110, 114 (D. Conn. 2002) (citing *Whittlesey v. Union Carbide Corp.,* 742 F.2d 724, 728 (2d Cir. 1984)), and thus is not appropriately decided at this juncture.

Defendant also asserts as an affirmative defense (*see* Def.'s Ans. & Aff. Defenses [Doc. # 14] at 6) that Plaintiff failed to mitigate damages because she did not apply to work at other supermarkets once she moved to South Carolina.  Because failure to mitigate is an affirmative defense, "an employer seeking to avoid a lost wages award bears the burden of demonstrating that a plaintiff has failed to satisfy the duty to mitigate." *Broadnax v. City of New Haven*, 415 F.3d 265, 268 (2d Cir. 2005).  While a "discharged employee must 'use reasonable diligence in finding other suitable employment,'" it "need not be comparable to their previous positions." *Greenway v. Buffalo Hilton Hotel*, 143 F.3d 47, 53 (2d Cir. 1998) (quoting *Ford Motor Co. v. EEOC,* 458 U.S. 219, 231–32 & n. 15 (1982)).  It is undisputed that Plaintiff applied to "ten to [fifteen] jobs every week" (Gaither Dep. at 190) and it is not material that Plaintiff did not apply to work at other

---

[10] Notably the *Truelove* plaintiff sought reinstatement to her former position yet could not offer a "satisfactory explanation for her not reapplying." 238 Conn. at 341. Here, Plaintiff does not seek reinstatement and has offered a justification for not reapplying, explaining that she did not feel that she was welcome to return given that Mr. Haberern had fired her rather than providing her with a leave of absence as she requested. (Pl.'s Resps. to Def.'s Interrogs., at 7–8; Gaither Dep. at 176, 182–84.)

supermarkets. Therefore, Defendant has not established it is entitled to summary judgment on this affirmative defense.

Finally, Defendant contends that Plaintiff should be precluded from recovering for emotional distress because she has contended in her Damages Analysis (Ex. 23 to Def.'s 56(a)1 at 2) that her emotional distress was "based on her homelessness in early 2003" and she cannot prove that Defendant proximately caused her homelessness beyond terminating her and her income.[11] (Def.'s Mem. Supp. at 18.) However, proximate cause "is ordinarily a question of fact" and it is for a jury to decide whether Plaintiff's termination was "a substantial factor in the resulting harm."[12] *Coburn v. Lenox Homes, Inc.*, 186 Conn. 370, 383–84 (1982).

Plaintiff has adduced sufficient evidence from which a jury could do so. Asked at her deposition to describe "the emotional distress you believe you suffered as a result of your issues with Stop & Shop that you described in your complaint," Plaintiff responded that being terminated was "devastating at the time, because I believed that they were going to give me a leave of absence" and did not anticipate being terminated. (Gaither

---

[11] In her deposition, Plaintiff did testify that her termination caused her homeless, because even though she would not have been paid during her maternity leave, she was told that her landlord said that if she was on leave rather than terminated, he could have "worked with" her. (Gaither Dep. at 205.) Because this statement is inadmissible hearsay when offered to prove the truth of the matter asserted, *see* Fed. R. Evid. 801(c), the Court does not rely on it in denying summary judgment.

[12] Further, contrary to Defendant's assertion, the Damages Analysis does not refer to Plaintiff's homelessness as a "cause" of emotional distress but rather refers to it as one of three examples of "[e]vidence of 'egregious' emotional distress," which also included having to relocate to South Carolina and "[t]reatment with mental health professional." (Damages Analysis at 2 (quoting *Holness v. Nat'l Mobile Television, Inc.*, No. 09 CV 2601 KAM RML, 2012 WL 1744847, at *4 (E.D.N.Y. Feb. 14, 2012)).

Dep. at 208–09.) Thus, a jury could reasonably conclude that Plaintiff's emotional distress was proximately caused by Defendant terminating her when she justifiably believed that her employer would grant her leave as required by CFEPA.

## III. Conclusion

For the reasons set forth above, Defendant's Motion [Doc. # 30] for Summary Judgment is DENIED.

IT IS SO ORDERED.

    /s/
Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 7th day of January, 2015.